# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |  |
|---|---|---|
| SAINT LAWRENCE COMMUNICATIONS LLC, | § § § § | |
| *Plaintiff*, | § § | CASE NO. 2:15-CV-351-JRG |
| v. | § § | |
| MOTOROLA MOBILITY LLC, | § § | |
| *Defendants*. | § § | |

## REDACTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a patent infringement case brought by Plaintiff Saint Lawrence Communications LLC ("SLC") against Defendant Motorola Mobility LLC ("Motorola"). The Court seated a jury on March 3, 2017, and a trial before that jury commenced on March 20, 2017. The jury then returned a unanimous verdict finding willful infringement and no invalidity. (Dkt. No. 34.)

After the close of evidence, and while the jury was deliberating, the Court provided the Parties an opportunity to present evidence and argument in support of and in opposition to, as appropriate, any equitable defenses urged by Motorola. At that time, the Parties agreed not to present any evidence or argument orally to the Court, electing instead to submit the issues to the Court on the papers. (Dkt. No. 58, 3/24 Trial Tr. at 3:22–4:14.) Thereafter, the Court issued an Order setting forth the post-trial briefing schedule on all outstanding issues, including Motorola's equitable defenses. (Dkt. No. 72.) The Court also granted the Parties' request for additional briefing on said equitable defenses. (Dkt. No. 85.) Accordingly, Motorola's equitable defenses of patent misuse and limitation of damages based on FRAND principles are now fully before the

Court. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court issues these Findings of Fact ("FF") and Conclusions of Law ("CL").

## I.    Findings of Fact

### A.    The Parties

**[FF1]**    Motorola is a corporation organized under the laws of the State of Delaware and headquartered in Chicago, Illinois. (Dkt. No. 1 at ¶ 2; Case No. 2:15-cv-349, Dkt. No. 46 at ¶ 2.) It is in the business of developing, among other things, cell phones and related technology. (Dkt. No. 46, 3/20 AM Trial Tr. at 52:12–15.)

**[FF2]**    SLC is a Texas limited liability company with its principal place of business in Plano, Texas. (Dkt. No. 1 at ¶ 1.) SLC is in the business of licensing and monetizing its patent portfolio. (Dkt. No. 46, 3/20 AM Trial Tr. at 40:13–16.)

### B.    Procedural History

**[FF3]**    On March 10, 2015, SLC filed its original complaint in this case. (Dkt. No. 1.) In that complaint, SLC alleged that certain Motorola products infringed U.S. Patent Nos. 6,795,805 ("the '805 Patent"), 6,807,524 ("the '524 Patent"), 7,151,802 ("the '802 Patent"), 7,260,521 ("the '521 Patent"), and 7,191,123 ("the '123 Patent") (collectively "Patents-in-Suit" or "Asserted Patents"). (*Id.*)

**[FF4]**    On June 25, 2015, this case was consolidated with a related case involving Saint Lawrence and ZTE Corporation et al. (Dkt. No. 7.)

**[FF5]**    On September 1, 2015, Motorola filed its original answer in this case. (Case No. 2:15-cv-349, Dkt. No. 46.) In its answer, Motorola denied SLC's allegations of infringement of the Patents-in-Suit and raised a defense of patent misuse. (*Id.*) Motorola additionally pled that "SLC's claim for damages may also be limited by FRAND principles." (*Id.* at ¶ 37.)

**[FF6]**     During discovery, Motorola identified documents and other materials supporting its patent misuse defense and its limitations on damages defense, including SLC's inconsistent royalty rates for its licensees to the Patents-in-Suit.  (Dkt. No. 74-2 (Ex. A to SLC's Opp'n) at 8–12.)

**[FF7]**     SLC did not move to dismiss Motorola's patent misuse defense, nor did SLC move for summary judgment or bring any other pretrial motion on this defense.

**[FF8]**     In the Parties' Joint Pretrial Order, Motorola contended that any claim by SLC for damages was limited by SLC's obligation to license the patents pursuant to FRAND principles.  (Case No. 2:15-cv-349, Dkt. No. 413 at 5, 7.)  Motorola also contended that SLC's claims were barred in whole or in part under the doctrine of patent misuse, and it identified patent misuse as a defense that it intended to assert at trial.  (*Id.* at 7, 12, 13.)

**[FF9]**     During the pretrial conference, SLC conceded that Motorola had raised, as an affirmative defense, an "equitable patent misuse defense" and stated that "both parties agree the question of patent misuse is an equitable defense" that the Court should decide.  (Case No. 2:15-cv-349, Dkt. No. 449, 2/21 Pretrial Conference Tr. at 54:9–55:15.)  The Parties then stipulated to a procedure for how they would present the evidence relating to Motorola's misuse defense.  (*Id.* at 64:20–65:11.)

**[FF10]**     A jury trial on the non-equitable issues in this case was held from March 20-March 24, 2017.  (Dkt. No. 45–58.)  On March 24, 2017, the jury returned a verdict finding willful infringement of claim 2 of the '805 Patent, claim 4 of the '524 Patent, claim 1 of the '802 Patent, claim 1 of the '521 Patent, and claim 102 of the '123 Patent.  (Dkt. No. 34 at 2, 5.)  The jury also did not find any claim invalid, and it further awarded damages in the amount of $9,177,483.  (*Id.* at 3–4.)

**[FF11]**    At the conclusion of trial, SLC and Motorola agreed that a separate bench trial was not needed to address the remaining equitable issues.  Instead, the Parties agreed that, to the extent Motorola wished to raise one or more of its equitable defenses, it would do so in post-trial briefing.  (Dkt. No. 58, 3/24 Trial Tr. at 3:22–4:14.)

**[FF12]**    The Court issued an order on April 14, 2017 setting a timeline for post-trial briefing, including Motorola's briefing in support of its equitable defenses.  (Dkt. No. 72.)

**[FF13]**    Pursuant to that order, on April 27, 2017, Motorola filed its opening brief on its equitable defenses of patent misuse and the FRAND limitations on damages.  (Dkt. No. 73.)  SLC filed its response on May 11, 2017.  (Dkt. No. 74.)  Motorola then filed an unopposed motion for leave to file limited additional briefing on the equitable issues (Dkt. No. 83), which the Court granted (Dkt. No. 85).  Motorola filed its limited additional briefing in the form of a reply on May 19, 2017.  (Dkt. No. 84.)  SLC filed a sur-reply on May 30, 2017, thereby concluding the parties' briefing on the equitable defenses of patent misuse and the limitation of damages due to FRAND principles.  (Dkt. No. 91.)

### C.    The Patents-in-Suit

**[FF14]**    The '805 Patent is entitled "Periodicity Enhancement in Decoding Wideband Signals."  (PX-1.)  The application for the '805 Patent was filed on October 27, 1999, and issued on September 21, 2004.  (*Id.*)  The inventors listed on the face of the '805 Patent are Bruno Bessette, Redwan Salami, and Roch Lefebvre.  (*Id.*)  At trial, SLC accused Motorola of infringing claim 2 of the '805 Patent.  (Dkt. No. 34.)

**[FF15]**    The '524 Patent is entitled "Perceptual Weighting Device and Method for Efficient Coding of Wideband Signals."  (PX-2.)  The application for the '524 Patent was filed on October 27, 1999, and issued on October 19, 2004.  (*Id.*)  The inventors listed on the face of the

'524 Patent are Bruno Bessette, Redwan Salami, and Roch Lefebvre. (*Id.*) At trial, SLC accused Motorola of infringing claim 4 of the '524 Patent. (Dkt. No. 34.)

**[FF16]** The '802 Patent is entitled "High Frequency Content Recovering Method and Device for Over-Sampled Synthesized Wideband Signal." (PX-3.) The application for the '802 Patent was filed on October 27, 1999, and issued on December 19, 2006. (*Id.*) The inventors listed on the face of the '802 Patent are Bruno Bessette, Redwan Salami, and Roch Lefebvre. (*Id.*) At trial, SLC accused Motorola of infringing claim 1 of the '802 Patent. (Dkt. No. 34.)

**[FF17]** The '521 Patent is entitled "Method and Device for Adaptive Bandwidth Pitch Search in Coding Wideband Signals." (PX-4.) The application for the '521 Patent was filed on October 27, 1999, and issued on August 21, 2007. (*Id.*) The inventors listed on the face of the '521 Patent are Bruno Bessette, Redwan Salami, and Roch Lefebvre. (*Id.*) At trial, SLC accused Motorola of infringing claim 1 of the '521 Patent. (Dkt. No. 34.)

**[FF18]** The '123 Patent is entitled "Gain-Smoothing in Wideband Speech and Audio Signal Decoder." (PX-5.) The application for the '123 Patent was filed on November 17, 2000, and issued on March 13, 2007. (*Id.*) The inventors listed on the face of the '123 Patent are Bruno Bessette, Redwan Salami, and Roch Lefebvre. (*Id.*) At trial, SLC accused Motorola of infringing claim 102 of the '123 Patent. (Dkt. No. 34.)

### D. The Patents-In-Suit as Standard Essential Patents

**[FF19]** The original owner of the Patents-in-Suit was a company called VoiceAge. (PX-1–5.)

**[FF20]** In 2000, VoiceAge, through a partnership with Nokia, entered a competition supervised by the European Telecommunications Standard Institute ("ETSI") and the Third Generation Partnership Project ("3GPP") for the development of a speech audio coding standard.

(Dkt. No. 46, 3/20 AM Trial Tr. at 109:20–112:9.) Nine competitors entered the preselection phase of the competition. (*Id.* at 113:10–17.) Together, VoiceAge and Nokia submitted a codec, referred to either as the "Nokia candidate" or the "Nokia/VoiceAge candidate." (*Id.* at 111:14–18.) The Nokia/VoiceAge candidate codec allowed for wideband speech coding capabilities and transmission components over cellular networks and channels. (*Id.* at 110:25–111:5.)

**[FF21]** Five candidates made it to the selection phase of the competition: Nokia/VoiceAge, Motorola, Texas Instrument, Ericsson, and a consortium of four other companies. (*Id.* at 113:18–114:6.)

**[FF22]** The Nokia/VoiceAge codec won, and it was then incorporated into the Adaptive Multi-Rate Wideband ("AMR-WB") standard by the standard setting organizations ETSI and 3GPP. (Dkt. No. 46, 3/20 AM Tr. at 115:10–22, 117:2–16; *see also* Dkt. No. 49, 3/21 AM Tr. at 13:24–14:1.)

**[FF23]** As part of this process, VoiceAge agreed, under ETSI's Intellectual Rights Policy, "to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions." (PX-133; DX-731; DX-1112.)

**[FF24]** An obligation to license on fair, reasonable and non-discriminatory terms is commonly abbreviated as a "FRAND" obligation. (Dkt. No. 51, 3/21 PM Sealed Trial Tr. at 19:7–15.)

**[FF25]** It is undisputed that SLC assumed VoiceAge's FRAND obligations when it acquired the Patents-in-Suit. (Dkt. No. 49, 3/21 AM Trial Tr. at 78:8–11; Dkt. No. 59, 3/21 PM Trial Tr. at 57:2–10.)

**[FF26]** As a result of the standardization process, AMR-WB became mandatory for a smartphone to make Voice over LTE ("VoLTE") calls over an LTE network, and certain carriers

made the standard mandatory for other types of networks, too. (Dkt. No. 52, 3/22/2017 PM Trial Tr. at 29:11–30:2 (explaining AMR-WB is necessary for VoLTE calls on Verizon and AT&T as well as international calls on Sprint); Dkt. No. 56, 3/23 Sealed Trial Tr. at 13:22–25 (███████ ████████████████████████).)

### E.  VoiceAge's Licensing of the Patents-In-Suit and the W-CDMA Patent Pool

[FF27]    The W-CDMA patent pool included patents related to W-CDMA or 3G cellular communication standards, including AMR-WB. (Dkt. No. 56, 3/23 Sealed Tr. at 3:16–23; Dkt. No. 49, 3/21 AM Tr. at 31:15–21.) Licensees received a license to all the patents in the pool. (*Id.*) Sipro Lab Telecom, a company with the same corporate principals as VoiceAge, managed the W-CDMA patent pool. (Dkt. No. 49, 3/21 AM Tr. at 31:22–32:5.)

[FF28]    In 2012, ████████████████████████████████████████████ ███████████████████. (Dkt. No. 56, 3/23 Sealed Tr. at 3:16–23.)

[FF29]    Licensees to the W-CDMA patent pool at that time paid a royalty of approximately $1 per phone. (Dkt. No. 49, 3/21 AM Trial Tr. at 74:18–20.) VoiceAge received only a portion of this royalty, calculated through the pool's patent weighting system. (*Id.* at 74:21–23.) VoiceAge believed the rate the W-CDMA patent pool was charging in 2012 was a FRAND rate for the pool. (*Id.* at 38:21–23.)

[FF30]    In 2013, VoiceAge withdrew the Asserted Patents from the W-CDMA patent pool and sold them to SLC's parent company. (*Id.* at 39:18–25; 59:6–8.)

### F.  SLC's Licensing of the Patents-in-Suit

[FF31]    Motorola was offered an opportunity to take a license to the W-CDMA Patent Pool. (Dkt. No. 49, 3/21 AM Trial Tr. at 31:22–24; 41:13–20.)

**[FF32]**    Motorola did not take a license to the W-CDMA patent pool while VoiceAge was a member of the pool, stating that it favored having bilateral negotiations with each one of the patent owners. (*Id.* at 41:21–42:11.)

**[FF33]**    To date, Motorola still has not licensed the Patents-in-Suit. (*Id.* at 28:17–20.)

**[FF34]**    Other mobile device manufacturers, including ███████████████████ ████████████, have taken licenses to the Asserted Patents. (Dkt. No. 51, 3/21 PM Sealed Trial Tr. at 21:2-15.) ██████████████████████████████████████████ ██████████. (*Id.*)

      **1.**    ████████████

**[FF35]**    ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ This estimate is sometimes called ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

**[FF36]**    The ████████████████████████████████████████

████████████████████████████ ████████████████████

**[FF37]**    There are various factors that might explain why ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ At this point, SLC would have had ████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

**[FF38]**   Even so, at the time ████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████   ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

**[FF39]**   There is also no evidence that ██████████████████████████

███████████████████████████████████████████████████

██████████

**[FF40]**   By the time SLC ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████ Thus, it would have been reasonable for SLC to ███████████████

████████████████████████.

2.      ████████████████

**[FF41]**   ████████████████████████████████████████████

███████████████████████████████████

**[FF42]** During its negotiations with ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**[FF43]** ████████████████████████████████████████████

██████████████████

**[FF44]** The ultimate agreement between the SLC ████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████

**[FF45]** ████████████████████████████████████████████

██████████████████████████

### 3.     Disclosure of W-CDMA Patent Pool

**[FF46]** When negotiating with potential smartphone manufacturer licensees, SLC listed all current licensees in its presentation materials. (DX-556; Dkt. No. 53, 3/22 PM Trial Tr. at 131:25–133:10.)

**[FF47]** However, these presentation materials did not distinguish between licensees who had agreed to rates as part of the W-CDMA patent pool and licensees who had separately licensed the Asserted Patents. (*Id.*)

**[FF48]** Additionally, SLC did not disclose information about the W-CDMA patent pool, including how much VoiceAge had received under the W-CDMA patent pool, to potential licensees either because SLC's representative in these negotiations, Ms. Wagner, was not aware of such information, including how much VoiceAge had received through the W-CDMA patent pool, or because Ms. Wagner thought the W-CDMA rates generally were irrelevant to negotiations relating to only the Asserted Patents. (Dkt. No. 50, 3/21/2017 PM Trial Tr. at 56:16–57:1.)

### 4. **The Threat of Injunction**

**[FF49]**

**[FF50]** However, Motorola did not establish that prospective licensees who were under the threat of an injunction actually paid substantially more than companies who were not. (Dkt. No. 74 at 11–12, 17–18.)

**[FF51]** Motorola also did not establish that the threat of an injunction actually caused licensees to be coerced into taking a license. (*Id.* at 17–18.) In fact, Motorola was enjoined by a court in Germany based on patents related to the Asserted Patents, yet it persisted in not taking a license to the Asserted Patents. (*Id.*)

### 5. **Representations to Potential Licensees**

**[FF52]**

**[FF53]** Motorola did not demonstrate that this confirmation, from SLC to Huawei, was a deliberate misrepresentation. (*See, e.g.,* Dkt. No. 55, 3/23/2017 AM Trial Tr. at 40:22–41:2 (testimony by Defendant's expert agreeing that the royalty rate communicated by SLC about the Samsung License could be discerned by "look[ing] at the agreement").)

### 6. **Effects of SLC's Licensing Conduct**

**[FF54]** Motorola did not establish that SLC's licensing conduct, including its practice of seeking worldwide licenses, actually harmed competition.

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard

**[CL1]**    Patent misuse is an equitable defense to a claim for patent infringement.  *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1184 (Fed. Cir. 2005); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) ("[A] holding of misuse renders the patent unenforceable until the misuse is purged; it does not, of itself, invalidate the patent.").

**[CL2]**    "[T]he key inquiry under the patent misuse doctrine is whether, by imposing the condition in question, the patentee has impermissibly broadened the physical or temporal scope of the patent grant and has done so in a manner that has anticompetitive effects."  *Princo Corp. v. Int'l Trade Com'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc).

**[CL3]**    While patent misuse must be established by the defendant, *id.* at 1338, courts are divided on whether a defendant must establish patent misuse by a preponderance or by clear and convincing evidence.  *Compare Universal Elecs., Inc. v. Universal Remote Control, Inc.*, No. SACV1200329AGJPRX, 2014 WL 12587050, at *8 (C.D. Cal. Dec. 16, 2014) (requiring "clear and convincing evidence that Plaintiff is barred from enforcing the '426 Patent against Defendant for patent misuse"), *with Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1118 (N.D. Ill. 2015) (applying preponderance of the evidence standard).

**[CL4]**    Having reviewed the relevant authorities, the Court is persuaded that applying a clear and convincing standard is the better view.  "[P]atent misuse arises from the equitable doctrine of unclean hands."  *C.R. Bard*, 157 F.3d at 1372 (Fed. Cir. 1998).  As such, patent misuse should be established by clear and convincing evidence, the same standard that is necessary to establish unclean hands.  *See In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1374 (Fed. Cir. 2007) (applying clear and convincing standard with respect to unclean hands); *see also Therasense, Inc.*

*v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287–90 (Fed. Cir. 2011) (concluding that inequitable conduct should be established by clear and convincing evidence because it "emerged from unclean hands"). Regardless, Motorola's patent misuse defense fails under either standard of proof.

**B.** **Analysis**

**1.** **Patent Misuse in SLC's Alleged Breach of FRAND**

**[CL5]** Motorola's first argument is that SLC engaged in patent misuse by violating or exceeding its FRAND obligations as to the Asserted Patents. (Dkt. No. 73 at 2.) In advancing this argument, Motorola primarily relies on three district court opinions: *Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618-H, 2012 WL 6863471, at *23 (S.D. Cal. Nov. 9, 2012); *Apple Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2011 WL 7324582, at *14 (W.D. Wis. June 7, 2011); and *UTStarcom, Inc. v. Starent Networks, Corp.*, No. 07 CV 2582, 2008 WL 5142194, at *2 (N.D. Ill. Dec. 5, 2008).

**[CL6]** In *Multimedia*, the district court observed, without extensive analysis, that "several courts have held that a patentee's violation of its [F]RAND obligations may *in certain circumstances* constitute patent misuse." 2012 WL 6863471, at *23 (emphasis added). In support of this proposition, the court cited *UTStarcom* and *Apple. Id.*

**[CL7]** In *UTStarcom*, the district court found, without citation, that an allegation that the plaintiff "fail[ed] to offer a license to the[] patents to [defendant] on reasonable, nondiscriminatory terms" after deliberately withholding information about the patents from the relevant standards organization was sufficient to state a counterclaim for patent misuse. *UTStarcom*, 2008 WL 5142194, at *2.

**[CL8]** In *Apple*, the district court similarly addressed the issue on a motion to dismiss, concluding that Apple's allegations sufficiently "state[d] a claim for patent misuse" based on the

allegation that Motorola had refused to license its patents on FRAND terms and also "ma[d]e *false commitments* that led to the establishment of worldwide standards incorporating its own patents and eliminating competing alternative techniques . . . ." *Apple*, 2011 WL 7324582, at \*13–14 (emphasis added).

**[CL9]**     Motorola also relies on *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), as did the district court in *Apple*. (Dkt. No. 73 at 2–3)  In *Broadcom*, the Third Circuit held that "a patent holder's *intentionally false promise* to license essential proprietary technology on [fair, reasonable and non-discriminatory terms], . . . [followed by] the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct."  501 F.3d at 314 (emphasis added).

**[CL10]**     None of these cases stand for the proposition that a breach of FRAND obligations constitutes patent misuse and Motorola has identified no case holding as such.  *See In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 916 (N.D. Ill. 2013) ("The parties have not cited, however, and the court has not found, any cases suggesting that the existence of a [F]RAND commitment provides a *complete* defense against an infringement lawsuit. Instead, most cases merely limit a patent holder's remedy to collecting a [F]RAND royalty . . . ."); *see also* Michael G. Cowie & Joseph P. Lavelle, *Patents Covering Industry Standards: The Risks to Enforceability Due to Conduct Before Standard-Setting Organizations*, 30 AIPLA Q.J. 95, 115–116, 148 (2002) (questioning whether a breach of FRAND obligations broadens the scope of a patent grant and noting that there are "no published misuse decisions" reaching this result).

**[CL11]**     Indeed, the Federal Circuit has cautioned against a broad application of the patent misuse doctrine. *See, e.g., Princo*, 616 F.3d  at 1329 ("Recognizing the narrow scope of [patent misuse], we have emphasized that the defense of patent misuse is not available to a

presumptive infringer simply because a patentee engages in some kind of wrongful commercial conduct, even conduct that may have anticompetitive effects."); *C.R. Bard*, 157 F.3d at 1373 ("Although the law should not condone wrongful commercial activity, the body of misuse law and precedent need not be enlarged into an open-ended pitfall for patent-supported commerce.").

**[CL12]**     Additionally, the only time Congress has spoken on the judicially created doctrine of misuse, it circumscribed the doctrine. *Id.* at 1329–1330 (discussing legislative history of 35 U.S.C. § 271(d)); *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42 (2006) (same).

**[CL13]**     Accordingly, this Court applies the standard articulated in *Princo*[1], focusing on whether SLC's conduct "broaden[s] the physical or temporal scope of the patent grant and . . . in a manner that has anticompetitive effects."   616 F.3d at 1328.   While a breach of FRAND obligations may be relevant to this inquiry, a breach of FRAND is not determinative of patent misuse.   *Cf. id.* at 1329 ("While proof of an antitrust violation shows that the patentee has committed wrongful conduct having anticompetitive effects, that does not establish misuse of the patent in suit unless the conduct in question . . . ha[s] been held to be outside the otherwise broad scope of the patent grant.").

**[CL14]**     Applying *Princo*, the Court is persuaded that SLC's conduct, in light of the facts of this case, does not constitute patent misuse.

**[CL15]**     First, the Court is not persuaded that SLC's efforts to seek injunctions in Germany "impermissibly broadened the physical or temporal scope of the patent grant." *Princo*, 616 F.3d at 1328; *Finjan, Inc. v. ESET, LLC*, No. 17-CV-00183-CAB-BGS, 2017 WL 3149642, at *4 (S.D. Cal. July 24, 2017) (Bencivengo, J.) ("Whatever legal action Finjan is taking in

---

[1] Motorola did not argue that SLC's alleged breach of its FRAND obligations constituted patent misuse *per se*. *Compare* (Dkt. No. 73 at 6), *with* (Dkt. No. 73 at 16).  Therefore, the Court does not apply the *per se* standard here.

Germany, none of ESET's allegations support a conclusion Finjan is 'physically' or 'temporally' broadening the scope of the patents in suit."); *see also* [FF50–FF51, FF55].

**[CL16]**    Motorola cites no evidence or authority that supports a contrary result.  At most, Motorola argues that seeking injunctions in Germany constituted a breach of SLC's FRAND obligations because SLC was required to license its patents on FRAND terms.  (Dkt. No. 73 at 13 ("Such actions violated SLC's contractual obligations to Motorola and other potential licensees, third party beneficiaries to SLC's obligation to license these SEPs under FRAND terms and conditions.").)  However, as explained above, this supposed breach of FRAND, *but see Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1331 (Fed. Cir. 2014) ("To the extent that the district court applied a *per se* rule that injunctions are unavailable for SEPs, it erred."), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015), is not determinate of patent misuse and here it is not indicative of SLC broadening the scope of its patent rights. [FF49–FF51].

**[CL17]**    Additionally, because Motorola did not establish that SLC's efforts to seek injunctions in Germany harmed competition, [FF54], Motorola necessarily fails to show that SLC's conduct constitutes misuse.  *Princo*, 616 F.3d at 1334 ("Princo urges us to overrule the line of authority in this court holding that patent misuse requires a showing that the patentee's conduct had anticompetitive effects. We decline to do so."); *see also Brunswick Corporation v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977) (noting that antitrust law protects "competition[,] not competitors").

**[CL18]**    Similarly, the Court is not persuaded that SLC engaged in patent misuse by negotiating different rates and terms for different licensees when presented with different circumstances.  [FF35–FF45, FF54].  To hold as such would tell patent owners that their first

license for a FRAND encumbered patent must also be their last, tying the hands of patent owners and future licensees who may not be similarly situated. *But see Brulotte*, 379 U.S. at 33 (distinguishing between a patent owner who "exact[s] royalties as high as he can negotiate" from one who "project[s] those royalty payments beyond the life of the patent" and thus engages in patent misuse).

**[CL19]** Finally, Motorola argues that SLC made various misrepresentations and omissions in its negotiations with potential licensees that amount to patent misuse, such as its failure to alert potential licensees to the effective royalty rate for the Asserted Patents as part of the W-CDMA pool. (Dkt. No. 73 at 13–14.) While the Court does not agree that SLC deliberately misrepresented or omitted material information to potential licensees, [FF46–FF48, FF52–54], even if it had, this sort of conduct, while potentially wrongful, would not rise to the level of patent misuse because Motorola did not demonstrate that this conduct harmed competition. [FF54].

**[CL20]** Even taken together, Motorola's evidence is insufficient to demonstrate that SLC's conduct constituted misuse. Motorola's defense here must therefore fail.[2]

### 2. Patent Misuse by Tying

**[CL21]** Motorola's second argument for patent misuse is that SLC used its alleged market power to engage in impermissible tying by requiring some licensees to obtain a single license for SLC's U.S. and German patents. (Dkt. No. 73 at 17.)

**[CL22]** "[T]he analysis of tying arrangements in the context of patent misuse is closely related to the analysis of tying arrangements in antitrust law." *U.S. Phillips*, 424 F.3d at 1185.

---

[2] To the extent Motorola's arguments as to the alleged FRAND violations also depend on a showing of market power in a clearly defined market, the Court declines to address this question because Motorola failed to establish that SLC's conduct harmed competition. [FF54].

**[CL23]**     However, "Congress has declared certain practices not to be patent misuse even though those practices might otherwise be subject to scrutiny under antitrust law principles." *Id.* at 1185–86 (discussing 35 U.S.C. § 271(d)).  These practices include "condition[ing] the license of any rights to the patent . . . on the acquisition of a license to rights in another patent," *unless* the patent owner "has market power for the patent . . . on which the license or sale is conditioned." 35 U.S.C. § 271(d)(5).

**[CL24]**     Therefore, patent misuse with respect to tying is a two-step inquiry.  First, the defendant must demonstrate that the patent holder has market power in a clearly defined market. *U.S. Phillips*, 424 F.3d at 1185.  Second, the defendant must establish that the conduct at issue is either *per se* misuse, or misuse under the rule of reason.  *Id.* ("[D]epending on the circumstances, tying arrangements can be viewed as *per se* patent misuse or can be analyzed under the rule of reason.").

**[CL25]**     With respect to the second step of this inquiry, the Federal Circuit has expressed skepticism that a patent-to-patent tying arrangement should be treated as *per se* misuse.  *See U.S. Phillips*, 424 F.3d at 1186 n.1 ("[W]e note that the legislative history [of 35 U.S.C. § 271(d)]. . . indicates congressional skepticism about treating tying arrangements in the context of patent licensing as *per se* patent misuse, rather than analyzing such arrangements under the rule of reason."); *see also Illinois Tool Works*, 547 U.S. at 36 ("The assumption that tying arrangements serve hardly any purpose beyond the suppression of competition, rejected in [*United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610 (1977)], has not been endorsed in any opinion since." (internal quotation marks and brackets omitted)).

**[CL26]**     In particular, the Federal Circuit has explained that "while grouping patents together in package licenses has anticompetitive potential, it also has potential to create substantial

procompetitive efficiencies such as clearing possible blocking patents, integrating complementary technology, and avoiding litigation." *Princo*, 616 F.3d at 1325 (internal quotation marks omitted); *see also U.S. Philips*, 424 F.3d at 1192–1193 ("In short, package licensing has the procompetitive effect of reducing the degree of uncertainty associated with investment decisions."); *Koninklijke Philips N.V. v. Cinram Int'l, Inc.*, No. CIV.A. 08-0515, 2013 WL 2301955, at *5 (S.D.N.Y. May 24, 2013) ("Defendants cannot entirely discount the benefit of the pooled arrangement in savings on 'transaction costs associated with making individual patent-by-patent royalty determinations and monitoring possible infringement of patents that particular licensees chose not to license.'" (quoting *U.S. Philips*, 424 F.3d at 1198)); *Texas Instruments, Inc. v. Hyundai Elecs. Indus., Co.*, 49 F. Supp. 2d 893, 901 (E.D. Tex. 1999) ("The portfolio license is widely used . . . because it is almost impossible on a patent-by-patent, country-by-country, product-by-product basis to determine whether someone is using a company's patents in a given country . . . ."); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 21–23 (1979) (discussing the "unique" benefits of package copyright licenses).

[CL27]    Without declaring that patent-to-patent tying is never *per se* misuse, the Court concludes that SLC's conduct here is not *per se* patent misuse.  Indeed, SLC's pursuit of worldwide licenses achieves many of the procompetitive efficiencies that the Federal Circuit identified in *U.S. Phillips* and emphasized again in *Princo*.[3]  For example, seeking a worldwide license helps both parties avoid the extraordinary transaction costs of litigating or licensing a global patent portfolio

---

[3] Although *U.S. Phillips* and *Princo* did not involve identical facts, the act of seeking worldwide licenses is sufficiently analogous to seeking a package license like the one at issue in *U.S. Phillips*.  424 F.3d at 1182 ("Potential licensees who sought to license patents to the technology for manufacturing CD-Rs or CD-RWs were not allowed to license those patents individually . . . .").

on a country-by-country or patent-by-patent basis.  *See Texas Instruments*, 49 F. Supp. 2d at 901

(noting the difficult of country-by-country policing of patent rights).

**[CL28]**    Accordingly, the Court applies the rule of reason analysis, *i.e.* "the finder of

fact must decide whether the questioned practice imposes an unreasonable restraint on competition,

taking into account a variety of factors, including specific information about the relevant business,

its condition before and after the restraint was imposed, and the restraint's history, nature and

effect." *U.S. Phillips*, 424 F.3d at 1197 (citing *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d

860, 869 (Fed. Cir. 1997)).

**[CL29]**    With reference to the rule of reason, Motorola identifies three anticompetitive

effects that supposedly flow from SLC's practice of seeking worldwide licenses for the Asserted

Patents: "extracting more money from licensees than they would have paid for just licenses to the

U.S. or German patents," "foreclosing development of workarounds of SLC's foreign patents,"

"harm[ing] other licensees' ability to compete with ███████████████████████████

████████" (Dkt. No. 73 at 17–18.)

**[CL30]**    However, Motorola did not carry its burden to show that SLC's conduct

violated the rule of reason.

**[CL31]**    First, as the Court found *supra* [FF54], Motorola did not demonstrate that

SLC's practice of seeking a worldwide license for its patent portfolio had anticompetitive effects.

**[CL32]**    Moreover, Motorola did not show that the potentially anticompetitive harms it

identified outweighed the potential benefits of SLC's licensing practices.  *U.S. Philips*, 424 F.3d

at 1198 (noting that the proper analysis with respect to the rule of reason and package licensing

balances the anticompetitive and procompetitive aspects of the conduct at issue); *see also Hornsby*

*Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1392 (5th Cir. 1983) ("Proof that the

[plaintiff's] activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason."); *Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers*, 620 F.2d 930, 934 (2d Cir. 1980) ("A rule of reason analysis requires a determination of whether an agreement is on balance an unreasonable restraint of trade, that is, whether its anti-competitive effects outweigh its pro-competitive effects."). In fact, Motorola engaged in no discussion of this issue in its single page treatment of the rule of reason. (Dkt. No. 73 at 17–18.)

**[CL33]**    Ultimately, the Court is not persuaded that SLC's decision to license its portfolio covering the AMR-WB standard on a worldwide basis constituted patent misuse *per se* or under the rule of reason.[4]  *See U.S. Philips*, 424 F.3d at 1192 n.5 (criticizing "[t]he implication . . . that a party with both an essential patent and a nonessential patent is not allowed to package the two together and only offer the package for a single price").

### C.    Limitation of Damages Based on FRAND Principles

**[CL34]**    Motorola also argues that "[i]n violation of its FRAND obligations, SLC's damages request at trial disregarded the rates paid in the W-CDMA patent pool, and instead relied on SLC's 'tinkered' with ██████ license and SLC's injunction-induced licenses." (Dkt. No. 73 at 19.) In doing so, Motorola essentially seeks to attack the jury's award of damages through the present briefing, which the Court limited to equitable issues.

**[CL35]**    Whether SLC violated its FRAND obligations is a question of fact. *Apple Inc. v. Samsung Elecs. Co.*, 920 F. Supp. 2d 1116, 1141 (N.D. Cal. 2013).

---

[4] Because SLC's conduct is not patent misuse *per se* or under the rule of reason, the Court finds it unnecessary to address whether Motorola appropriately defined a relevant market or established that SLC has market power in such a market.

**[CL36]**     During the trial, the jury heard extensive evidence from both parties relating to whether the license SLC sought (and ultimately received) from Motorola in this particular case complied with FRAND.

**[CL37]**     Rather than permit Motorola to attack the jury's award of damages through the guise of an equitable defense, the Court will address the jury's verdict through the traditional channels: motions pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure.

## III.    <u>CONCLUSION</u>

For the reasons set forth above, the Court concludes that: (1) Motorola has failed to establish that SLC committed patent misuse, either through its licensing practices or through its tying arrangements; and (2) Motorola can urge any arguments that the jury's verdict is not supported by the evidence through motions pursuant to Rules 50(b) and 59 of the Federal Rules of Evidence.

**So ORDERED and SIGNED this 15th day of February, 2018.**


_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE